STEPHEN A. HIGGINSON, Circuit Judge,
concurring in part and dissenting in part:
I too would deny the State’s motion for a blanket stay of the district court judgment *306 entered on August 29, 2014, pending appeal. I agree with a stay of the district court’s facial invalidation of the admitting-privileges requirement because the plaintiffs did not request that relief. See Jackson Women’s Health Org. v. Currier, 760 F.3d 448, 458 (5th Cir.2014). Second, I agree with a stay to allow enforcement of the operational requirements of the ambulatory surgical center (“ASC”) provision because the district court only evaluated the burdens imposed by the provision’s physical plant requirements. Applying H.B. 2’s severability provision, however, I would not stay the district court’s facial invalidation of the physical plant requirements. Finally, I would narrow the stay so that it does not reach the admission-privileges requirement as applied to the McAllen and El Paso clinics, which the district court found would result in closure of all clinics west and south of San Antonio.[1]
As to the first stay factor, the district court found, after trial with witness credibility determinations, that an undue burden existed because Texas had over forty abortion clinics prior to the enactment of H.B. 2, and that after the ASC provision takes effect, only seven or eight clinics will remain, representing more than an 80% reduction in clinics statewide in nearly fourteen months, with a 100% reduction in clinics west and south of San Antonio. See Okpalobi v. Foster, 190 F.3d 337, 357 (5th Cir.1999) (“A measure that has the effect of forcing all or a substantial portion of a state’s abortion providers to stop offering such procedures creates a substantial obstacle to a woman’s right to have a pre-viability abortion, thus constituting an undue burden under Casey.”), vacated on other grounds on reh’g en banc, 244 F.3d 405 (5th Cir.2001); cf. also Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (finding no undue burden when “no woman seeking an abortion would be required by the new law to travel to a different facility than was previously available”); Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 869, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (“[I]t falls to us to give some real substance to the woman’s liberty to determine whether to carry her pregnancy to full term.”). The district court further found that there was no credible evidence of medical or health benefit associated with the ASC requirement in the abortion context. At this emergency stay point, the State does not challenge as clear error either set of factual findings.[2] Weighing *307 lack of medical benefit against the significant reduction in clinic access, the district court found the burden to be “undue.”
The majority opinion disagrees, concluding especially that the district court “erred when it balanced the efficacy of the ambulatory surgical center provision against the burdens the provision imposed.” For my part, I -do not read Abbott II to preclude consideration of the relationship between the severity of the obstacle imposed and the weight of the State’s interest in determining if the burden is “undue.” Although I agree with the majority opinion that Abbott II rejected the district court’s assessment of empirical data as part of its rational-basis analysis, see 748 F.3d at 594, Abbott II did not expressly disclaim such an inquiry for purposes of the undue-burden prong, see id. at 590 (referring to “Casey’s undue burden balancing test” (emphasis added)). In Abbott II-in contrast to the district court’s factual findings in this case-our court concluded that there had been “no showing whatsoever that any woman [would] lack reasonable access to a clinic within Texas.” Id. at 598. In light of the minimal or non-existent burden found on that record, the court in Abbott II did not need to conduct an in-depth analysis of the State’s interest as part of its undue-burden review. Other courts’ criticism of Abbott II on this ground is therefore inexact. See Planned Parenthood Ariz., Inc. v. Humble, 753 F.3d 905, 914 (9th Cir.2014); Planned Parenthood Se., Inc. v. Strange, No. 2:13cv405-MHT, — F.Supp.3d -,-, 2014 WL 3809403, at *7-8 (M.D.Ala. Aug. 4, 2014).
Consistent with this analysis, the district court considered the weight of the State’s interest in its undue-burden review. See Barnes v. Mississippi 992 F.2d 1335, 1338 (5th Cir.1993) (“As long as Casey remains authoritative, the constitutionality of an abortion regulation thus turns on an examination of the importance of the state’s interest in the regulation and the severity of the burden that regulation imposed on the woman’s right to seek an abortion.”); see also Casey, 505 U.S. at 878, 112 S.Ct. 2791 (“Unnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right.” (emphasis added)). In doing so, the district court adhered to reasoning that reconciles, rather than divides, circuit authority applying Casey’s undue-burden test. See, e.g., Humble, 753 F.3d at 912 (“[W]e compare the extent of the burden a law imposes on a woman’s right to abortion with the strength of the state’s justification of the law. The more substantial *308 the burden, the stronger the state’s justification for the law must be to satisfy the undue burden test.”); Van Hollen, 738 F.3d at 798 (“The feebler the medical grounds, the likelier the burden, even if slight, to be ‘undue’ in the sense of disproportionate or gratuitous.”); see also Robekt A. Leflae, Appellate Judicial Opinions 235 (1974) (“[Competing values ... must somehow be brought together so that as much as possible of the good in each can be protected and preserved.”).
I also do not see a strong likelihood of legal error related to the district court’s demographic calculations pertaining to impact on women, relevant both to its facial invalidation of the ASC provision, as well as to our stay factors. First, the district court recognized that there are 5.4 million women of reproductive age in Texas. Next, the district court found that if the ASC provision goes into effect, 900,000 women will live more than 150 miles from an abortion clinic; 750,000 women will live more than 200 miles from a clinic; and some women will live as far as 500 miles or more from a clinic. Furthermore, the district court explicitly considered the financial and other practical obstacles that interact with and compound the burdens imposed by the law, both in it its discernment of a substantial obstacle and also in its assessment of impact on women.[3] Finally, the district court also found that the remaining seven or eight abortion ASCs lack sufficient capacity to accommodate all women seeking abortions in the state. Indeed, these remaining clinics would have to increase by at least fourfold the number of abortions they perform annually. Altogether, although the district court did not use the phrase “large fraction,” its findings — which related not only to travel distances but also to other practical obstacles — demonstrate that enforcement of the ASC provision will likely affect a significant number and a large fraction of women across the state of Texas. See Casey, 505 U.S. at 893-95, 112 S.Ct. 2791 (facially invalidating Pennsylvania’s spousal-notification requirement because it would “likely prevent a significant number of women from obtaining an abortion” (emphasis added)).
As to the remaining stay factors, which reasonable minds may balance differently, and in this case do, it is nonetheless undisputed that the State for decades has not held plaintiffs’ clinics to ASC standards — indeed, never until now. Based on the record established at trial, assessed firsthand by the district court, I do not perceive that Texas has demonstrated urgency, medical or otherwise, to immediate enforcement. After hearing conflicting expert testimony, the district court found that “abortion in Texas [is] extremely safe with particularly low rates of serious complications,” and further found that “risks are not appreciably lowered for patients who undergo abortion at ambulatory surgical centers.” The denial of a stay would preserve this status quo pending our court’s ultimate decision on the correctness of the district court’s ruling. See Commodity Futures Trading Comm’n v. British Am. Commodity Options Corp., 434 U.S. 1316, 1320, 98 S.Ct. 10, 54 L.Ed.2d 28 (1977).
On the other hand, the district court found that if the ASC requirement goes into effect plaintiffs likely will suffer substantial injury, notably that enforcement would cause clinics to close in Corpus *309 Christi, San Antonio, Austin, McAllen, El Paso, Houston, and Dallas. The longer these clinics remain closed, the less likely they are to reopen if this court affirms that the law is unconstitutional. The district court further found that only seven or eight clinics will remain open, and that these clinics alone lack sufficient capacity. Unless shown to be clear error, this circumstance is comparable to the one the Seventh Circuit observed would subject patients “to weeks of delay because of the sudden shortage of eligible [clinics] — and delay in obtaining an abortion can result in the progression of a pregnancy to a stage at which an abortion would be less safe, and eventually illegal.” See Van Hollen, 738 F.3d at 796.
Agreeing not to impose a blanket stay on direct appeal, but not having convinced colleagues whom I respect as to the scope of the stay that is appropriate, I would grant the State’s independent request to expedite its appeal of an underlying issue that has complexity which divides courts, as well as profundity which divides convictions deeper than the rules of law courts must apply.

. I do not believe that the State has shown a strong likelihood of success on the merits of its argument that this as-applied challenge is barred by res judicata. This court in Abbott II disavowed relying on any new factual developments that were not in the record before the district court during the bench trial in Abbott. See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott (Abbott II), 748 F.3d 583, 599 n. 14 (5th Cir.2014). Significantly, Abbott II anticipated that physicians, like those in McAllen and El Paso, would gain admitting privileges. See id. at 598-99 & n. 13; see also Planned Parenthood of Wis., Inc. v. Van Hollen, 738 F.3d 786, 807 (7th Cir.2013) (Manion, J., concurring) ("The notion that abortion doctors will be unable to obtain admitting privileges is a fiction.”). Indeed, as Abbott II acknowledged, “[l]ater as-applied challenges can always deal with subsequent, concrete constitutional issues.” Id. at 589; see also lackson Women’s Health Org., 760 F.3d at 450-51 (evaluating the impact of H.B. 1390 after the plaintiff's doctors were conclusively denied admitting privileges). Now that the physicians' applications have been denied, the availability of abortion services for women living near the McAllen and El Paso clinics has concretely changed. See Restatement (Second) of Judgments § 24, cmt. (f) ("Where important human values ... are at stake, even a slight change of circumstances may afford a sufficient basis for concluding a second action may be brought.”).

. The majority opinion lists the following additional findings made by the district court, *307 which are entitled to deference, see Anderson v. Bessemer, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); N.A.A.C.P. v. Fordice, 252 F.3d 361, 365 (5th Cir.2001): (1) the construction costs of bringing existing clinics into compliance with ASC standards "will undisputedly approach 1 million dollars and will most likely exceed 1.5 million dollars”; (2) for existing clinics that cannot comply due to physical space limitations, "[t]he cost of acquiring land and constructing a new compliant clinic will likely exceed three million dollars”; (3) if both challenged H.B. 2 provisions are enforced, women's travel distances to clinics will significantly increase: 1.3 million women of reproductive age in Texas will live more than 100 miles from a clinic, 900,000 women will live more than 150 miles from a clinic, 750,000 women will live more than 200 miles from a clinic, and some women will live as far as 500 miles from a clinic; (4) the burdens of increased travel combine with "practical concerns include[ing] lack of availability of child care, unreliability of transportation, unavailability of appointments at abortion facilities, unavailability of time off from work, immigration status and ... poverty level, [and] the time and expense involved in traveling long distances”; and (5) the remaining seven or eight clinics will unlikely have the capacity to perform 60,000-72,000 abortions per year in Texas.

. Indeed, the State forthrightly acknowledged during oral argument that the real-world context in which women’s decisions are made and operate does factor into the undue-burden analysis, even if the State will contend that the record does not support the interplay of circumstance and law that the district court held to be determinative.