MANSFIELD, Justice (dissenting).
Abortion is one of the most divisive issues in America today. Each side in the debate is motivated by a serious, legitimate concern: on the one hand, a woman's ability to make decisions regarding her own body; on the other, human life.
Whatever one may think of the United States Supreme Court's abortion cases, they recognize this point. As Justices O'Connor, Kennedy, and Souter wrote for the Court in Planned Parenthood of Southeastern Pennsylvania v. Casey ,
Abortion is a unique act. It is an act fraught with consequences for others: for the woman who must live with the implications of her decision; for the persons who perform and assist in the procedure; for the spouse, family, and society which must confront the knowledge that these procedures exist, procedures some deem nothing short of an act of violence against innocent human life; and, depending on one's beliefs, for the life or potential life that is aborted.
505 U.S. 833, 852, 112 S.Ct. 2791, 2807, 120 L.Ed.2d 674 (1992). Accordingly, in Casey , the Court concluded, "Though the woman has a right to choose to terminate or continue her pregnancy before viability, it does not at all follow that the State is prohibited from taking steps to ensure that this choice is thoughtful and informed." Id. at 872, 112 S.Ct. at 2818 (plurality opinion). "States are free to enact laws to provide a reasonable framework for a woman to make a decision that has such profound and lasting meaning." Id. at 873, 112 S.Ct. at 2818.
Unfortunately, the majority opinion lacks this sense of balance and perspective. Forgoing accepted methods of constitutional interpretation, the opinion instead relies at times on an undertone of moral criticism toward abortion opponents. From reading the majority opinion, one would barely know that abortion-with few exceptions-was continuously illegal in Iowa from the time our constitution was adopted until the United Supreme Court overrode our law by deciding Roe v. Wade , 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). From reading the majority opinion, one would scarcely be aware that many women in Iowa are pro-life and strongly support the same law the court concludes unconstitutionally discriminates against them.
After considering the text, original meaning, and subsequent interpretation of the constitutional provisions at issue, the record in this case, the district court's carefully written decision, and abortion cases from around the country, I conclude that the waiting period in Senate File 471 does not violate either article I, section 9 or article I, section 6 of the Iowa Constitution.
*247 I. The Majority Disregards the Text and Original Understanding of the Constitutional Provisions at Issue.
I will begin where constitutional interpretation ought to begin: with the relevant constitutional provisions. Article I, section 9 states, "[N]o person shall be deprived of life, liberty, or property, without due process of law." Iowa Const. art. I, § 9. Article I, section 6 provides, "All laws of a general nature shall have a uniform operation; the general assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens." Id. art. I, § 6.
Neither provision as worded or as originally understood supports a right-let alone a fundamental right-to terminate a pregnancy. I will examine article I, section 9 first. The majority presumably concludes that a law mandating a 72-hour waiting period for an abortion is a "depriv[ation] of ... liberty ... without due process of law ." Id. art. I, § 9 (emphasis added).
This sounds like a contradiction. How can a law deny due process of law? Indeed, our framers would have found the notion of substantive due process as self-contradictory as it sounds. The Chairman of the Committee on the Bill of Rights, Mr. Ells, explained to the convention that this clause had been "transcribed ... from" the United States Constitution, and that due process means "no person shall be deprived of life, liberty or property, without a legal proceeding based upon the principles of the common law, and the constitution of the United States." 1 The Debates of the Constitutional Convention of the State of Iowa 101-02 (W. Blair Lord rep., 1857) [hereinafter The Debates ], www.statelibraryofiowa.org/services/collections/law-library/iaconst. The due process clause, in other words, guarantees certain procedures . The idea of substantive due process would have made no sense to our framers.
Turning to article I, section 6, it consists of two clauses: one requiring uniformity and the other prohibiting special privileges and immunities. Iowa Const. art. I, § 6. A 72-hour waiting period for an abortion is uniform, and it doesn't grant a special privilege.
An article that I cowrote examined the original understanding of article I, section 6. Edward M. Mansfield & Conner L. Wasson, Exploring the Original Meaning of Article I, Section 6 of the Iowa Constitution , 66 Drake L. Rev. 147 (2018). I won't repeat the article, which goes into the convention debates and other contemporary sources, but the article concludes, "The uniformity clause was designed to be a barrier against geographic discrimination, the privileges and immunities clause a barrier against government-bestowed monopolies (or oligopolies)." Id. at 201.
Additionally, the Iowa Constitution-including article I, section 9 and article I, section 6-became effective on September 3, 1857. Six months later, on March 15, 1858, the general assembly adopted a law making abortion a crime under all circumstances, "unless the same shall be necessary to preserve the life of such woman." 1858 Iowa Acts ch. 58, § 1 (codified at Revisions of 1860, Statutes of Iowa § 4221). Abortion remained generally illegal in Iowa until Roe v. Wade was decided over one hundred years later. Given this timing, i.e., the fact that a ban on abortion was adopted right after the constitution became effective, it is difficult to conceive that a legislatively mandated waiting period for abortion would have violated the original understanding of either article I, section 9 or article I, section 6.
Of course, "originalism is not the only available tool in constitutional interpretation."
*248 State v. Seats , 865 N.W.2d 545, 577 (Iowa 2015) (Mansfield, J., dissenting). But the majority wants it both ways. In the first part of its opinion, the majority quotes a number of broad, general pronouncements by the framers of our constitution at the 1857 convention. Yet the majority ignores that which is far more relevant-(1) the text those framers actually approved, and (2) what they said concerning the meaning of that text. For example, the majority quotes Mr. Ells's general remarks on the importance of a Bill of Rights, but ignores what Mr. Ells said specifically one page later concerning the meaning of the due process clause. See 1 The Debates at 101-02.
Yes, the framers debated and adopted an extensive bill of rights. But they did so because the specific text and meaning of each right mattered.
The majority tries to align itself with two opinions of our court from the 1970s and one opinion from 2016, implying that they endorsed its notion of a living constitution. See Griffin v. Pate , 884 N.W.2d 182 (Iowa 2016) ; In re Johnson , 257 N.W.2d 47 (Iowa 1977) ; Pitcher v. Lakes Amusement Co ., 236 N.W.2d 333 (Iowa 1975). There is a difference.
Pitcher presented the question whether a rule allowing for nonunanimous civil jury verdicts violated article I, section 9 of the Iowa Constitution. 236 N.W.2d at 334. We held it did not. Id. at 338. We reasoned that article I, section 9 preserved "the general concept of a right to jury trial" but did not freeze every characteristic that a jury trial had in 1857. Id. As we stated, "From obvious necessity a carefully limited flexibility was developed in the construction of constitutions." Id. at 336.
Johnson involved a constitutional challenge to the lack of jury trials in juvenile delinquency proceedings. 257 N.W.2d at 48. We concluded that neither article I, section 9 nor article I, section 10 of the Iowa Constitution required jury trials. Id. at 48, 51. We pointed out that the juvenile court system did not exist in 1857 and that a constitution's purpose is "to meet conditions neither contemplated nor foreseeable at the time of its adoption." Id. at 50.
Griffin involved the constitutionality of a law denying the vote to anyone who had committed a felony. 884 N.W.2d at 185. This turned on the meaning of "infamous crime" as used in our state constitution. Id. We said that "the concept of infamy is not locked into a past meaning"; it could evolve. Id. at 186. However, even based on "community standards of today," all felonies remained infamous crimes, and there was no constitutional violation. Id. at 198.
Thus, in all three cases- Pitcher , Johnson , and Griffin -we recognized that the Iowa Constitution was living in the sense that it could adapt to legislative enactments reflecting new societal needs. See Griffin , 884 N.W.2d at 185-86, 198-205 ; Johnson , 257 N.W.2d at 48 ; Pitcher , 236 N.W.2d at 334-35. This makes sense, since it is primarily the job of the elected branches of government, not the judiciary, to be responsive to changing conditions. "Statutes do not serve as constitutional definitions but provide us the most reliable indicator of community standards to gauge the evolving views of society important to our analysis." Griffin , 884 N.W.2d at 198.
This case involves something quite different. Here, by contrast, the majority has used the living constitution not as a means of adapting to "the community standard expressed by our legislature," id. at 205, but as a way of erecting a strict scrutiny barrier to legislative action without reference to the constitutional text or history.
We may not personally agree with the legislature's judgments. I made it clear that I did not believe someone convicted of a felony who had completed her or his *249 sentence should be denied the right to vote. Chiodo v. Section 43.24 Panel , 846 N.W.2d 845, 863 (Iowa 2014) (Mansfield, J., specially concurring). In the end, though, that's irrelevant.
II. The Majority's One-Sided Substantive Due Process Analysis Does Not Give Due Consideration to the Interests on Each Side.
Although I doubt that our framers contemplated substantive due process as part of article I, section 9, our court does have a line of substantive due process cases in the area of parenting and procreation. The majority cites these. See McQuistion v. City of Clinton , 872 N.W.2d 817, 833 (Iowa 2015) (recognizing a fundamental right to procreate); In re Guardianship of Kennedy , 845 N.W.2d 707, 714-15 (Iowa 2014) (recognizing a fundamental right to procreate); State v. Seering , 701 N.W.2d 655, 663-64 (Iowa 2005) (recognizing a right to live with one's family); Callender v. Skiles , 591 N.W.2d 182, 190-92 (Iowa 1999) (recognizing the due process rights of a biological father); Olds v. Olds , 356 N.W.2d 571, 574 (Iowa 1984) (recognizing that how to parent a child implicates a fundamental liberty interest).
I agree with the majority to this extent: One can reasonably read these precedents and conclude that laws relating to abortion also implicate substantive due process rights. Still, there is a crucial difference. In none of those other areas was there a fundamental interest on the other side of the ledger. The fact that there are two profound concerns-a woman's autonomy over her body and human life-has to drive any fair-minded constitutional analysis of the problem. As I have already pointed out, it underlies the "undue burden" standard set forth in Casey.
Regrettably, instead of admitting there are two weighty concerns, the majority eloquently describes one of these concerns while diminishing the other. Thus, the majority states, and I agree, that "[a]utonomy and dominion over one's body go to the very heart of what it means to be free." And later the majority defines abortion in terms of "[w]hether a woman is personally prepared and capable of assuming life-altering obligations and expectations." I agree that being a parent is a life-altering obligation that falls unevenly on women in our society.
But abortion has another aspect to which the majority gives short shrift. Referring to the anti-abortion side, the majority uses the word "life" at times, but typically as part of the phrase "promoting potential life." This anodyne phrasing treats restrictions on abortion as if they were analogous to tax credits for having more children. Elsewhere, the majority characterizes Senate File 471 as based on "moral scruples" against abortion. Here again, the majority's language minimizes the anti-abortion position. As a practical matter, it equates opposition to abortion with opposition to gambling.
To be clear, many if not most abortion opponents view it as ending a life .[8]
*250 III. Since Casey , Most Waiting Periods Have Been Upheld Under the Undue Burden Standard.
The relevant United States Supreme Court precedent on waiting periods is Casey , 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674. In Casey , the Supreme Court rejected a constitutional challenge to the waiting period in the Pennsylvania Abortion Control Act of 1982, which required that a woman seeking an abortion be given specified information at least twenty-four hours before the abortion was performed. Id. at 844, 112 S.Ct. at 2803 (majority opinion).
Thus, the Supreme Court held a state's regulation of abortion will not be deemed unconstitutional unless it is an undue burden on the woman's right. Id. at 877, 112 S.Ct. at 2820-21 (plurality opinion). A regulation is an undue burden if "its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." Id. at 878, 112 S.Ct. at 2821. Nevertheless, "not every law which makes a right more difficult to exercise is, ipso facto , an infringement of that right." Id. at 873, 112 S.Ct. at 2818. The Court elaborated,
Numerous forms of state regulation might have the incidental effect of increasing the cost or decreasing the availability of medical care, whether for abortion or any other medical procedure. The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it. Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause.
Id. at 874, 112 S. Ct. at 2819. "Not all burdens on the right to decide whether to terminate a pregnancy will be undue." Id. at 876, 112 S.Ct. at 2820.
Contrary to the majority's view, Casey 's undue burden standard was not an unprincipled decision by Justices O'Connor, Kennedy, and Souter "to deviate downward" in constitutional jurisprudence. It was an effort to recognize the unique status of this particular constitutional conflict between a woman's autonomy and respect for human life.
Based upon this framework, the Supreme Court concluded the 24-hour waiting period imposed by the Pennsylvania law was constitutional and not an undue burden. Id. at 887, 112 S.Ct. at 2826. It stated,
The idea that important decisions will be more informed and deliberate if they follow some period of reflection does not strike us as unreasonable, particularly where the statute directs that important information become part of the background of the decision.
Id. at 885, 112 S. Ct. at 2825. In so doing, the Court acknowledged many of the arguments raised here by Planned Parenthood:
The findings of fact by the District Court indicate that because of the distances many women must travel to reach an abortion provider, the practical effect will often be a delay of much more than a day because the waiting period requires that a woman seeking an abortion make at least two visits to the *251 doctor . The District Court also found that in many instances this will increase the exposure of women seeking abortions to "the harassment and hostility of anti-abortion protestors demonstrating outside a clinic." As a result, the District Court found that for those women who have the fewest financial resources, those who must travel long distances, and those who have difficulty explaining their whereabouts to husbands, employers, or others, the 24-hour waiting period will be "particularly burdensome."
Id. at 885-86, 112 S. Ct. at 2825 (emphasis added) (quoting Planned Parenthood of Se. Pa. v. Casey , 744 F.Supp. 1323, 1351-52 (E.D. Pa. 1990) ).
Yet in the end, the Casey Court concluded that the waiting period, despite "increasing the cost and risk of delay of abortions," was not a substantial obstacle to the woman's ultimate decision. Id. at 886, 112 S.Ct. at 2825 (quoting Casey , 744 F.Supp. at 1378 ). As one court has put it, " Casey thus makes clear that the substantial obstacle test is, as the name suggests, substantial." Tucson Women's Ctr. v. Ariz. Med. Bd. , 666 F.Supp.2d 1091, 1098 (D. Ariz. 2009). Particularly,
[i]t requires more than State-sponsored informed consent and State-sponsored advocacy for childbirth. It requires more than delay and inconvenience. Indeed, even when the restriction in question is "particularly burdensome" for women with few financial resources, women who must travel long distances, and women who may have difficulty explaining their whereabouts to husbands, employers, or others, the Supreme Court held that the burden does not rise to the level of a substantial obstacle that invalidates the statute.
Id. ; see also Karlin v. Foust , 188 F.3d 446, 484, 486 (7th Cir. 1999) ; Utah Women's Clinic, Inc. v. Leavitt , 844 F.Supp. 1482, 1487-88 (D. Utah 1994), rev'd in part on other grounds, appeal dismissed in part , 75 F.3d 564 (10th Cir. 1995).
Waiting periods are not uncommon in Iowa law. We have a three-day waiting period for marriage. See Iowa Code § 595.4 (2018). There is a 72-hour waiting period after birth for adoption. See id. § 600A.4(2)(g ). There is a ninety-day waiting period for divorce. See id. § 598.19. All of these waiting periods implicate fundamental constitutional interests in marriage and parenting. The legislature mandated waiting periods to ensure these important life decisions were made after time for reflection. No one can reasonably question the legislature's power to impose these waiting periods before Iowans begin or end a marriage or give up a newborn baby for adoption. So why can't the legislature impose a waiting period before an abortion?
A clear majority of courts since Casey have upheld abortion waiting periods under both state and federal constitutions. See Cincinnati Women's Servs., Inc. v. Taft , 468 F.3d 361, 372-74 (6th Cir. 2006) (finding a 24-hour waiting period mandated by Ohio law not an undue burden); A Woman's Choice-E. Side Women's Clinic v. Newman , 305 F.3d 684, 685, 692-93 (7th Cir. 2002) (declaring an 18-hour waiting period under Indiana law not an undue burden); Karlin , 188 F.3d at 485-86 (finding that a 24-hour delay imposed hardships "generally no different than those the Court in Casey held did not amount to an undue burden"); Planned Parenthood, Sioux Falls Clinic v. Miller , 63 F.3d 1452, 1467 (8th Cir. 1995) (noting South Dakota's 24-hour waiting period was "virtually identical" to those previously upheld and was not an undue burden); Fargo Women's Health Org. v. Schafer , 18 F.3d 526, 527, 535 (8th Cir. 1994) (finding arguments raised against North Dakota's 24-hour *252 waiting period were "substantially similar" to those raised in Casey and provision not an undue burden); Barnes v. Moore , 970 F.2d 12, 14-15 (5th Cir. 1992) (per curiam) (noting Mississippi's 24-hour waiting period was not an undue burden under Federal Constitution); Tucson Women's Ctr. , 666 F.Supp.2d at 1104-05 (declining to issue preliminary injunction because "[p]laintiffs have failed to show that they are likely to succeed in their claim that the 24-hour provision imposes an undue burden on the right of Arizona women to an abortion"); Summit Med. Ctr. of Ala., Inc. v. Siegelman , 227 F.Supp.2d 1194, 1206 (M.D. Ala. 2002) (refusing to enjoin Alabama's Woman's Right to Know Act, which provided 24-hour waiting period); Eubanks v. Schmidt , 126 F.Supp.2d 451, 456 (W.D. Ky. 2000) ("Simply put, the twenty-four hour informed consent period makes abortions marginally more difficult to obtain, but ... it does not fundamentally alter any of the significant preexisting burdens facing poor women who are distant from abortion providers."); Leavitt , 844 F.Supp. at 1487-88 ("Even if [Utah law] were to specifically mandate two visits to the abortion clinic for every woman, it could not be found facially unconstitutional on those grounds."); Clinic for Women, Inc. v. Brizzi , 837 N.E.2d 973, 976, 987-88 (Ind. 2005) (concluding Indiana's 18-hour waiting period was not an undue burden under Indiana Constitution); Pro-Choice Miss. v. Fordice , 716 So.2d 645, 656 (Miss. 1998) ("Because the mandatory consultation and twenty-four hour delay ensures that a woman has given thoughtful consideration in deciding whether to obtain an abortion, [Mississippi law] does not create an undue burden and is therefore constitutional."); Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon , 185 S.W.3d 685, 691-92 (Mo. 2006) (en banc) (per curiam) (concluding Missouri's 24-hour waiting period was not an undue burden); Preterm Cleveland v. Voinovich , 89 Ohio App.3d 684, 627 N.E.2d 570, 579 (1993) (finding no facial invalidity under Ohio Constitution of a law establishing a 24-hour waiting period).
Two state supreme courts have invalidated waiting periods after rejecting the undue burden test. Gainesville Woman Care, LLC v. State , 210 So.3d 1243, 1254, 1263-64 (Fla. 2017) (enjoining a 24-hour waiting period under Florida Constitution); Planned Parenthood of Middle Tenn. v. Sundquist , 38 S.W.3d 1, 16, 24 (Tenn. 2000) (invalidating Tennessee's 48-hour waiting period). As I discuss below, one of those states (Florida) has express privacy language in its constitution; the other state case (Tennessee) is no longer controlling law in Tennessee because it was overruled by a constitutional amendment.[9]
Also, in Planned Parenthood of Delaware v. Brady , the court enjoined a 24-hour waiting period because the law lacked *253 an exception for a medical emergency that was not life-threatening. 250 F.Supp.2d 405, 410 (D. Del. 2003). In any event, Senate File 471 includes exceptions both to protect the mother's life and for a medical emergency. 2017 Iowa Acts ch. 108, § 1 (codified at Iowa Code § 146A.1(2)(b ) ) ("Compliance with the prerequisites of this section shall not apply to ... [a]n abortion performed in a medical emergency.").
Only two trial courts have invalidated waiting periods while applying the undue burden test. See Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of Health , 273 F.Supp.3d 1013, 1043 (S.D. Ind. 2017) (granting preliminary injunction against enforcement of an Indiana law that required an 18-hour waiting period and an ultrasound before obtaining abortion) (appeal pending); Planned Parenthood of Minn., N.D., S.D. v. Daugaard , 799 F.Supp.2d 1048, 1065-66 (D.S.D. 2011) (concluding South Dakota's 72-hour delay was an undue burden); see also June Med. Servs. v. Gee , 280 F.Supp.3d 849, 869 (M.D. La. 2017) (denying a motion to dismiss a challenge to a 72-hour waiting period in Louisiana because the plaintiffs sufficiently pleaded that the law imposed an undue burden).
Eight states have laws currently in force with waiting periods longer than twenty-four hours. See Ala. Code § 26-23A-4(a) (Westlaw current through 2018-579) (forty-eight hours); Ark. Code Ann. § 20-16-1703(b)(1) (West, Westlaw current through 2018 Fiscal Sess. & 2d Extraordinary Sess.) (forty-eight hours); La. Stat. Ann. § 1061.17(B)(3)(a) (Westlaw current through 2018 1st Extraordinary Sess.) (seventy-two hours); Mo. Ann. Stat. § 188.039(2) (West, Westlaw current through 2018 2d Reg. Sess.) (seventy-two hours); N.C. Gen. Stat. Ann. § 90-21.82(1) (West, Westlaw current through 2017 Reg. Sess.) (seventy-two hours); Okla. Stat. Ann. tit. 63, § 1-738.2(B)(1) (West, Westlaw current through ch. 17 of 2d Extraordinary Sess.) (seventy-two hours); Tenn. Code Ann. § 39-15-202(d)(1) (West, Westlaw current through 2018 2d Reg. Sess.) (forty-eight hours); Utah Code Ann. § 76-7-305(2)(a) (West, Westlaw current through various chs. of 2018 Gen. Sess.) (seventy-two hours).
As the foregoing discussion indicates, the United States Supreme Court has upheld a 24-hour waiting period in Casey ; other courts generally follow Casey ; and several other states besides Iowa have 72-hour waiting periods in effect that have not been enjoined.
Planned Parenthood's main argument against the constitutionality of the waiting period in Senate File 471 is that it will require a woman to make "two trips" in order to obtain an abortion. I do not discount this argument. However, this precise argument was made and rejected in Casey . The majority makes no attempt to distinguish Casey . In the end, I don't think one can distinguish it. The majority simply says it is not the test under the Iowa Constitution.
IV. Other States Apply the Undue Burden Standard Under Their State Constitutions, and Those That Don't Generally Have Privacy Language Not Found in Iowa's Constitution.
A number of states have relied on the undue burden test in evaluating the constitutionality of abortion restrictions under their state constitutions. Hope Clinic for Women, Ltd. v. Flores , 372 Ill.Dec. 255, 991 N.E.2d 745, 757, 763 (2013) ; Brizzi , 837 N.E.2d at 983-84 (applying a "material burden" standard under the Indiana Constitution that is "the equivalent of Casey 's undue burden test");
*254 Hodes & Nauser, MDs, P.A. v. Schmidt , 52 Kan.App.2d 274, 368 P.3d 667, 676 (2016) (en banc), review granted (Apr. 11, 2016); Fordice , 716 So.2d at 655 ; Nixon , 185 S.W.3d at 691-92 ; see also Planned Parenthood Ariz., Inc. v. Am. Ass'n of Pro-Life Obstetricians & Gynecologists , 227 Ariz. 262, 257 P.3d 181, 189 (Ariz. Ct. App. 2011) (applying the undue burden test after finding that the Arizona Constitution recognizes no more expansive right to an abortion).
I acknowledge that some other states have rejected the undue burden test, as the majority has done today. Yet a crucial distinction is that those states typically have explicit guarantees of privacy in their constitutions. And for the most part, those privacy guarantees have been adopted only recently.
In Valley Hospital Ass'n v. Mat-Su Coalition for Choice , the Alaska Supreme Court expressly rejected the undue burden test expounded in Casey . 948 P.2d 963, 969 (Alaska 1997). The court relied on an Alaska Constitution provision that states, "The right of the people to privacy is recognized and shall not be infringed." Id. at 968 (quoting Alaska Const. art. I, § 22 ). The court noted that "[t]his express privacy provision was adopted by the people in 1972" and "provides more protection of individual privacy rights than the United States Constitution." Id.
In Gainesville Woman Care, LLC , the Florida Supreme Court struck down Florida's mandatory 24-hour waiting period as violating the right to privacy in the Florida Constitution added by voters in 1980. 210 So.3d at 1247, 1252, 1265. The court explained that this standard meant a challenger had no obligation to show the law imposed an "undue burden or significant restriction." Id. at 1255.
Similarly, in Montana, the state supreme court struck down an abortion restriction and rejected the undue burden standard. Armstrong v. State , 296 Mont. 361, 989 P.2d 364, 384 (1999). The court based its decision to depart from federal precedent on the presence of a separate privacy provision in the Montana Constitution, which had been added in 1972. Id. at 372-74 ; see also Mont. Const. art. II, § 10 (adopted 1972).
Sundquist departed from federal precedent and declined to follow the undue burden standard even though Tennessee's constitution has no specific privacy guarantee. 38 S.W.3d at 16-17. As previously noted, though, that decision was overturned by a Tennessee constitutional amendment. See Tenn. Const. art. I, § 36 (amended 2014).
Hence, states relying on the due process clauses of their state constitutions typically have applied the undue burden test.[10]
Like those other state courts, I would apply Casey under the Iowa Constitution, at least until the Supreme Court offers a different legal standard for our consideration. As of now, I am persuaded by the thoughtful and nuanced analysis undertaken by Justices O'Connor, Kennedy, and Souter for the Supreme Court plurality in Casey .
The majority's requirement of "strict scrutiny" and "narrow tailoring"-combined with its rejection of Casey 's undue *255 burden standard-would make any abortion restriction very difficult to sustain. In recent years, only in the areas of sexually violent predators and termination of parental rights have we found that a law or ordinance passed strict scrutiny review in our court. Compare In re L.M. , 654 N.W.2d 502, 505-07 (Iowa 2002), and In re Det. of Garren , 620 N.W.2d 275, 286 (Iowa 2000), with Mitchell County v. Zimmerman , 810 N.W.2d 1, 16-18 (Iowa 2012), In re A.W. , 741 N.W.2d 793, 811 (Iowa 2007), Spiker v. Spiker , 708 N.W.2d 347, 352 (Iowa 2006), In re S.A.J.B. , 679 N.W.2d 645, 650-51 (Iowa 2004), Lamberts v. Lillig , 670 N.W.2d 129, 133 (Iowa 2003), and Santi v. Santi , 633 N.W.2d 312, 321 (Iowa 2001).
The majority caricatures the undue burden test. It says that such a test enables the State to adopt any abortion restriction "so long as it stop[s] just short of requiring women to move heaven and earth." I am puzzled by this hyperbole. It ignores the fact that Casey struck down one of Pennsylvania's laws-a spousal-notification provision-under the undue burden test, even though the law had a number of exceptions. 505 U.S. at 887-98, 112 S.Ct. 2791 (majority opinion). It ignores the fact that two abortion waiting periods have been enjoined by federal district courts under the undue burden test. Planned Parenthood of Ind. & Ky., Inc. , 273 F.Supp.3d at 1043 ; Planned Parenthood of Minn., N.D., S.D. , 799 F.Supp.2d at 1065-66. It ignores the fact that our court has repeatedly struck down laws in other areas even when applying a more forgiving standard than the undue burden test. See, e.g. , Hensler v. City of Davenport , 790 N.W.2d 569, 588-89 (Iowa 2010) ; State v. Dudley , 766 N.W.2d 606, 617, 622 (Iowa 2009) ; Varnum v. Brien , 763 N.W.2d 862, 896, 904 (Iowa 2009) ; Racing Ass'n of Cent. Iowa v. Fitzgerald , 675 N.W.2d 1, 16 (Iowa 2004).[11]
V. The Waiting Period in Senate File 471 Does Not Violate the Undue Burden Standard.
I must now confront whether the waiting period in Senate File 471 passes the undue burden test. The issue is a close one, but I believe it does.
To begin with, I believe the 72-hour waiting period-like other waiting periods for important decisions-serves a legitimate purpose. Although various studies were discussed in the district court, only the Utah study directly addresses the relevant issues. See Sarah C.M. Roberts, et al., Utah's 72-Hour Waiting Period for Abortion: Experiences Among a Clinic-Based *256 Sample of Women , 48 Persp. on Sexual & Reprod. Health 179 (2016) [hereinafter Roberts].
This published, peer-reviewed study directly examined the effect of Utah's 72-hour waiting period by following up with a sample of 309 women who had sought abortion services. Id. Of these women, twenty-seven reported that they were no longer seeking an abortion after the mandatory waiting period. Id. at 182. This is approximately 8% of the women surveyed. To quote the study itself, "Eight percent of women reported changing their minds." Id. at 185.
Approximately 4000 abortions are performed each year in Iowa, approximately 3000 by Planned Parenthood. Thus, the State extrapolates from the Utah data that a 72-hour waiting period would likely result in 320 fewer abortions (8% of 4000) being performed in Iowa.
The majority concludes that the number is much lower because only 2% out of the 8% started out certain they wanted to have an abortion. Others were more conflicted. The majority then compares this number to the 1 to 3% who change their minds in jurisdictions without mandatory waiting periods.
The majority's comparison is apples to oranges, however. If 8% decide not to have an abortion when there is a waiting period and 1 to 3% decide not to have an abortion when there is no waiting period , the difference made by the waiting period is 5 to 7%, or approximately 200 to 280 fewer abortions per year.
Alternatively, one can subtract from the 8% the 3% who indicated in the baseline survey that they preferred to have the baby, on the theory that they would have been screened out by Planned Parenthood anyway. That leaves 5% who wanted to have the abortion, even though some may have had a degree of conflict.
In addition, the Utah study challenges the majority's view as to the overall burdens resulting from a 72-hour waiting period. The study states, "[A]lthough some advocates argue that logistical difficulties presented by two-visit requirements and waiting periods make women unable to have abortions, this was not the case in our study cohort." Id. (footnote omitted)
Thus, based on a scholarly study of actual experience, a 72-hour waiting period leads to at least 5 and potentially as much as 8% of women changing their minds, but does not prevent a woman who still wanted an abortion after the waiting period from getting one. It does result in "logistical and financial difficulties, including increasing the cost of having an abortion by about 10%." Id.
Second, the majority overlooks the role of Planned Parenthood's own business decisions. In 2008, Iowa became the first state where telemedicine abortions were widely performed. Planned Parenthood of the Heartland, Inc. v. Iowa Bd. of Med. , 865 N.W.2d 252, 255 & n.1 (Iowa 2015). A telemedicine abortion involves a remote video connection to a physician who is not physically present in the clinic. Id. at 255.
By October 2013, Planned Parenthood had fifteen clinics throughout Iowa that provided abortion services. When the Iowa Board of Medicine adopted a rule prohibiting telemedicine abortions, Planned Parenthood sued to enjoin the rule and represented that it would be forced to close clinics unless it could continue telemedicine abortions. See id. at 261, 268. Applying the Casey standard under the Iowa Constitution, we found in favor of Planned Parenthood and struck down the rule. Id. at 269. We noted the board of medicine had adopted a separate rule that generally approved the use of telemedicine in medical *257 procedures. Id. We further noted that there had been little discussion before the board as to how the telemedicine abortion rule would protect a woman's health. Id. In sum, we said, "It is difficult to avoid the conclusion that the Board's medical concerns about telemedicine are selectively limited to abortion." Id. I joined the opinion because, under Casey , I was not convinced the board's telemedicine abortion rule served its stated medical purpose.[12]
Yet Planned Parenthood closed clinics anyway. Today it has five clinics in Iowa.[13] If Planned Parenthood still operated fifteen clinics, many of the concerns raised by the majority would not exist.
Planned Parenthood provided no information as to its budget or finances. We are asked to take it on faith that Planned Parenthood could not operate more clinics or open those clinics on more days by either raising additional funds, reducing expenses, or using its existing funds differently. As a nonprofit charitable entity, Planned Parenthood's operations are already subject to public scrutiny to a significant degree, for example, through the filing of Form 990's with the IRS.
Third, the majority relies a great deal on hypothetical examples developed by a Wisconsin professor of community environmental sociology. But this witness claimed-incorrectly-there are no data on women who are actually unable to get an abortion because of waiting periods. As she put it, "We have identified some factors that make some women more vulnerable than others, but there is no data." In fact, the Utah study provided those data, and they showed one woman out of 309 was unable to have an abortion because the waiting period pushed her outside the permissible time window. Roberts, 48 Persp. on Sexual & Reprod. Health at 185.
Casey emphasized that under the undue burden test, "[w]hat is at stake is the woman's right to make the ultimate decision, not a right to be insulated from all others in doing so." 505 U.S. at 877, 112 S.Ct. at 2821 (plurality opinion). "[T]he State may take measures to ensure that the woman's choice is informed, and measures designed to advance this interest will not be invalidated as long as their purpose is to persuade the woman to choose childbirth over abortion." Id. at 878, 112 S.Ct. at 2821. "[U]nder the undue burden standard a State is permitted to enact persuasive *258 measures which favor childbirth over abortion, even if those measures do not further a health interest." Id. at 886, 112 S.Ct. at 2825.
Casey reasoned that "at some point increased cost could become a substantial obstacle," but a "slight" increase in cost would not be. Id. at 901, 112 S.Ct. at 2833. Casey also reasoned that "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." Id. at 894, 112 S.Ct. at 2829.
The majority misconstrues this last statement from Casey . With a facial challenge to a waiting period, under Casey , the plaintiff must consider the group of persons for whom the law is a restriction. Presumably, that is almost all women seeking an abortion in Iowa, because almost all of them would not choose to wait seventy-two hours after their initial abortion-related appointment to undergo the abortion. The majority, however, focuses on subsets of those persons, such as rape victims and the indigent. That would be appropriate for an as-applied challenge, not a facial one. With a facial challenge, the plaintiff must show that the law operates as a substantial obstacle in "a large fraction" of the cases where it is a restriction at all. Id. at 895, 112 S.Ct. at 2830.[14]
Having said all this, I believe the issue is indeed close. Common sense tells me that waiting periods lead to more considered decision-making and to some changes of mind. The Utah study quotes women who, after the 72-hour waiting period, "just couldn't do it" and changed their mind. Roberts, 48 Persp. on Sexual & Reprod. Health at 182.
But common sense also tells me that requiring two trips will result in emotional and financial costs. It will make it more difficult for some women to have medication abortions and force them into riskier and more invasive surgical abortions. Inevitably, a 72-hour waiting period will end up being longer than seventy-two hours in many cases.
Ultimately, I give considerable weight to the empirical evidence from Utah, to Casey 's express approval of a 24-hour period despite the fact that it would necessitate two trips, and to other federal and state court decisions sustaining waiting periods. I cannot conclude that the 72-hour waiting period in Senate File 471 is facially invalid under article I, section 9 of the Iowa Constitution.
VI. The Waiting Period in Senate File 471 Does Not Violate Article I, Section 6.
Article I, section 6 does not present as close a question for me. I do not follow the majority's reasoning that Senate File 471 violates equal protection of the laws. Equal protection requires treating similarly situated people alike, see, e.g. , Tyler v. Iowa Dep't of Revenue , 904 N.W.2d 162, 166 (Iowa 2017), yet the very gist of the majority's argument is that women are situated differently from men. They alone bear the burdens of pregnancy. The majority cites no other court that has accepted this line of thinking-i.e., that an abortion restriction per se discriminates against all women while unconstitutionally favoring men. See Bray v. Alexandria Women's Health Clinic , 506 U.S. 263, 270, 113 S.Ct. 753, 760, 122 L.Ed.2d 34 (1993) ("Whatever one thinks of abortion, it cannot be denied that *259 there are common and respectable reasons for opposing it, other than hatred of, or condescension toward (or indeed any view at all concerning), women as a class-as is evident from the fact that men and women are on both sides of the issue.").
The majority of course does not need to reach article I, section 6, since it has already invalidated the 72-hour waiting period under article I, section 9. Thus, I wonder if the majority is laying groundwork instead, perhaps a stepping stone toward a ruling that Iowa's Medicaid program must fund abortions. See, e.g. , Harris v. McRae , 448 U.S. 297, 338, 100 S.Ct. 2701, 2706, 65 L.Ed.2d 784 (1980) (Marshall, J., dissenting) (arguing that denial of Medicaid funding for medically necessary abortions "is a form of discrimination repugnant to the equal protection of the laws guaranteed by the Constitution").
In lieu of citing supportive caselaw, the majority asserts that without the benefit of the majority's ruling, women may "never fully assume a position in society equal to men, who face no such similar constraints for comparable sexual activity."
This statement, to my mind, epitomizes the difficulties with the majority opinion. I am confident that many Iowans wholeheartedly agree with the court's statement. However, I am equally confident many Iowans are offended by it. Is it really the basis on which the court wishes to render an enduring constitutional decision?
For the foregoing reasons, I would affirm the judgment of the district court.
Waterman, J., joins this dissent.

I am also troubled by the majority's view that failing to recognize abortion "as a fundamental right" is legally equivalent to upholding laws against "homosexual sodomy." In Lawrence v. Texas , the Supreme Court noted there was only limited historical basis for such sodomy laws and even more limited historical basis for their enforcement. 539 U.S. 558, 567-71, 123 S.Ct. 2472, 2478-80, 156 L.Ed.2d 508 (2003). The Court concluded, "Laws prohibiting sodomy do not seem to have been enforced against consenting adults acting in private." Id. at 569, 123 S.Ct. at 2479.
Apart from any historical differences, there is a more basic difference between an act which many view as extinguishing a human life and one which affects nobody but its participants. For the Lawrence Court, it was dispositive that the state was relying entirely on moral concerns to ban purely private conduct between consenting adults that did not involve "injury to a person." Id. at 567, 123 S.Ct. at 2478. Obviously, the Supreme Court does not share the majority's theory of equivalence because it invalidated a law against homosexual sodomy in Lawrence but has adhered to the undue burden test set forth in Casey .

The amendment provides in part, "Nothing in this Constitution secures or protects a right to abortion or requires the funding of an abortion." Tenn. Const. art. I, § 36. The dissent in Sundquist turned out to be prescient:
Undoubtedly, the issue of abortion is one of the most controversial and fiercely debated political issues of our time, and any resolution of this issue can only be achieved through deliberative, thoughtful, and public dialogue. Nevertheless, with its decision today, the Court has elevated one extreme of this debate to a constitutional level and has made any meaningful compromise on this issue all but impossible. The Court has done so simply by proclaiming that the right to obtain an abortion is "fundamental" under the Tennessee Constitution, and that as such, our Constitution effectively removes from the General Assembly any power to reach a reasonable compromise that considers all of the important interests involved.
38 S.W.3d at 25 (Barker, J., dissenting in part and concurring in part).

Some states have applied strict scrutiny to abortion legislation, but have neither approved nor rejected the undue burden test. See Doe v. Maher , 40 Conn.Supp. 394, 515 A.2d 134, 156-57 (1986) ; Moe v. Sec'y of Admin. & Fin. , 382 Mass. 629, 417 N.E.2d 387, 402-04 (1981) ; Women of State of Minn. ex rel. Doe v. Gomez , 542 N.W.2d 17, 31 (Minn. 1995) ; Right to Choose v. Byrne , 91 N.J. 287, 450 A.2d 925, 933-34 (1982).
Michigan state courts have found no right to an abortion at all in their state constitution. Mahaffey v. Att'y Gen. , 222 Mich.App. 325, 564 N.W.2d 104, 109-11 (1997).

Besides the Casey undue burden test and the majority's approach, there is a third alternative. In Casey , four dissenters took the following position:
The States may, if they wish, permit abortion on demand, but the Constitution does not require them to do so. The permissibility of abortion, and the limitations upon it, are to be resolved like most important questions in our democracy: by citizens trying to persuade one another and then voting.
505 U.S. at 979, 112 S.Ct. at 2873 (Scalia, J., concurring in the judgment in part and dissenting in part).
On a blank slate, I might agree with this view, but we have now been living under Casey for a generation. Although Casey is inconsistent with the original understanding of our framers, substantive due process has evolved and our court has previously indicated that article I, section 9 protects certain rights related to procreation and families. See McQuistion , 872 N.W.2d at 833 ; Callender , 591 N.W.2d at 190-91. As I've already noted, a number of state supreme courts have followed Casey under their own constitutions. The State does not advocate for a standard other than the Casey undue burden test in this case. In the past, I have criticized our court for "freelancing under the Iowa Constitution without the benefit of an adversarial presentation." State v. Tyler , 830 N.W.2d 288, 299 (Iowa 2013) (Mansfield, J., dissenting). For now, I find Casey persuasive.

As we noted in our previous Planned Parenthood case, the Supreme Court "applies the undue burden test differently depending on the state's interest advanced by a statute or regulation." Planned Parenthood of the Heartland , 865 N.W.2d at 263. In other words, Casey distinguished between health-related measures and informed-choice measures for purposes of the undue burden test. See id. at 263-64 ; see also Casey , 505 U.S. at 878, 112 S.Ct. at 2821 (plurality opinion). With a health-related measure, we concluded that Casey "requires us to weigh the strength of the state's justification for a statute against the burden placed on a woman seeking to terminate her pregnancy." Planned Parenthood of the Heartland , 865 N.W.2d at 264.
A year later, the Supreme Court confirmed that we had read federal precedent correctly. In Whole Woman's Health v. Hellerstedt , the Supreme Court struck down two health-related restrictions on the performance of abortions, concluding that "neither of these provisions confers medical benefits sufficient to justify the burdens upon access that each imposes." 579 U.S. ----, ----, 136 S.Ct. 2292, 2301, 195 L.Ed.2d 665 (2016).
This case, of course, involves the other prong of Casey : informed decision-making.

Some but not all of the closings were due to the legislature's decision no longer to reimburse Planned Parenthood for providing family planning services. The majority implicitly criticizes the legislature for cutting off funds for nonabortion-related services. I believe we should not participate in this policy debate, which is not before us and is not part of the present case.

I might agree with the majority that a 72-hour waiting period ought to have an exception for victims of rape. The majority notes that Senate File 471 has no such exception. Yet for the majority this is really beside the point because the majority would invalidate the law with or without such an exception.